## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **In re: Fitzpatrick Container Company,** | : | **Chapter 7** |
| | : | |
| **Debtor.** | : | **Bky.  No. 20-14139 (PMM)** |
| | : | |
| | : | |
| **Lynn E. Feldman, Chapter 7 Trustee,** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **John B. Lynch, Jr.,** | : | |
| | : | |
| **Defendant.** | : | **Adv.  No.  23-00070 (PMM)** |
| | : | |

# **O P I N I O N**

## I. INTRODUCTION

Fitzpatrick Container Company ("FCC" or the "Debtor") operated as a paper and corrugated packaging company in Allentown, Pennsylvania for several decades until it was placed into an involuntary chapter 7 bankruptcy.  In this Adversary Proceeding, Lynn E. Feldman, the chapter 7 trustee (the "Trustee"), seeks to avoid a series of payments (the "Transfers") made by FCC to Jack B. Lynch, Jr. ("Lynch" or the "Defendant")[1] between 2017 and 2019.  The Trustee relies on theories of actual and constructive fraudulent transfer, under both the Bankruptcy Code and state law, as well as a theory of unjust enrichment.

---

[1]     For simplicity, the Defendant will be referred to as "Lynch."  The Defendant's son is named John Lynch, III and was briefly examined as a witness for the Defendant.  The Defendant's son will be identified as "Lynch, III."

Because the Court finds that the Trustee is not permitted to avoid any of the Transfers, judgment will be entered in favor of the Defendant.

## II. PROCEDURAL HISTORY

On October 19, 2020, four (4) petitioning creditors filed an involuntary chapter 7 petition against FCC.  See doc. # 1 in the main case.[2]  The petition was not timely controverted, and the order for relief was entered on December 23, 2020.  See doc. # 11 in the main case.  The Trustee was appointed five (5) days later but was unable to file schedules until March 13, 2023, due to noncompliance from FCC's principal, Thomas Shallow, Jr. ("Shallow").  See In re Fitzpatrick Container Co., 663 B.R. 648, 652 (Bankr. E.D. Pa. 2024).

The Trustee commenced this Adversary Proceeding on October 30, 2023.  Doc. # 1.  The Trustee sought to avoid transfers made to the defendant under 12 Pa.C.S. § 5104(a) through 11 U.S.C. § 544(b), under 12 Pa.C.S. § 5105 through 11 U.S.C. § 544(a), under 11 U.S.C. § 548(a)(1)(A), and under 11 U.S.C. § 548(a)(1)(B).  Additionally, the Complaint stated causes of action for recovery of the transfers pursuant to 11 U.S.C. § 550[3] and for unjust enrichment.  The Defendant moved for summary judgment on July 11, 2024.  Doc. # 79.  Summary judgment was denied in large part, allowing the case to proceed to trial.  See In re Fitzpatrick, 663 B.R. at 661.

---

[2]      Docket entries in the main bankruptcy case (20-14139) are noted as such; all other docket entries refer to the above-captioned Adversary Proceeding.

[3]      The ability of the Trustee to avoid the challenged transfers is a necessary predicate to recovery under 11 U.S.C. § 550.  Because none of the transfers are avoidable, the § 550 claim is not addressed.

The parties presented evidence at a bench trial held on January 27 and January 28, 2025.
Several witnesses testified, including expert witnesses for both parties.

The parties disagreed about the propriety of taking judicial notice of pleadings and
exhibits filed in related adversary proceedings and post-trial briefs have been submitted on that
issue.[4]  See doc. #'s 132, 137.

### III. FINDINGS OF FACTS

Based on the credibility of the witnesses and the plausibility of their testimony, and upon
review of the relevant evidence, the Court makes the following findings of fact.

**Fitzpatrick Container Company**

1. FCC operated in southeastern Pennsylvania and its primary business was the design and
   manufacture of corrugated boxes.

2. For several decades into the late twentieth century, FCC was owned equally and operated
   jointly by the Lynch and Shallow families.

3. Jack B. Lynch, Jr. and his brother-in-law, Thomas Shallow, Sr., ran the business as
   president and vice president, respectively, until at least the early 1990's.

---

[4]      The Trustee brought similar avoidance actions against several parties in this bankruptcy.  Lynch argued that
the Court should take judicial notice of the substance of these other adversary proceedings.  He asserts that because
the Trustee has at times alleged Lynch's debt as a legitimate obligation, she cannot now attempt to avoid that
obligation by taking an inconsistent position here.  For three (3) reasons, the substance of the Trustee's other
complaints will not be considered in rendering this decision.

        First, the allegations in other complaints have almost no probative value.  They are allegations made over a
year ago at a time prior to several material developments in the present proceedings and are thus irrelevant.  Second,
it is well-understood that parties are free to plead claims inconsistently or in the alternative.  See Fed. R. Civ. P. 8.
Third, Lynch suffers no prejudice from my decision to ignore those related pleadings.  In this Opinion, judgment is
rendered for the Defendant without qualification based on the record; consideration of the related complaints would
have no effect on the ruling.

4. During or prior to 2007, Thomas Shallow, Jr. succeeded Lynch as president of FCC.

5. The relationship between the Lynches and Shallows was amiable until sometime prior to 2007 when the relationship became acrimonious.

6. In 2007, Lynch, along with his wife, Josephine, and son, Lynch, III, entered a "Purchase, Settlement and Mutual Release Agreement" (the "2007 Agreement") with members of the Shallow family.

7. Among other things, the 2007 Agreement transferred ownership of FCC entirely to the Shallow family and disentangled ownership of other entities that were previously jointly owned by the two (2) families.

8. Lynch was almost entirely uninvolved with FCC after the 2007 agreement.

9. Shallow was president of FCC until the company was placed into this involuntary bankruptcy.

**FCC Retirement Obligation to Lynch**

10. Brian McGowan ("McGowan") is a certified public accountant.

11. McGowan has known Lynch personally for over seventy (70) years.

12. McGowan worked for Lynch on financial matters, as needed, over the last twenty-six (26) years.

13. While Lynch was president of FCC, McGowan was engaged to assist Lynch and Thomas Shallow Sr. in a creating a retirement plan for the two (2) executives.

14. Sometime during or prior to 2003, McGowan assisted in preparing a "non-qualified deferred compensation/retirement plan" for both executives.

15. As part of this agreement, FCC agreed to pay retirement benefits to Lynch.

16. No written copy of the original retirement agreement is in evidence.

4

17. Paragraph 6 of the 2007 Agreement is titled "Lynch Jr. Retirement Benefits" and reaffirms an obligation of FCC to provide $6,066.66 monthly payments to Lynch for the remainder of his natural life.

18. FCC began making monthly payments to Lynch prior to the execution of the 2007 Agreement.

19. FCC made the Transfers, regular monthly payments of $6,066.66, to Lynch between October 3, 2016, and August 9, 2019.

20. Shallow, while president of FCC, understood FCC to be legally obligated to make the Transfers.

21. The last of the Transfers was made on August 9, 2019, and no evidence suggests payments were made by FCC to Lynch after this date.

22. Lynch filed a proof of claim in the lead bankruptcy case alleging an unsecured claim of $359,166.32 based on "unpaid retirement" payments.

**The 2007 Agreement**

23. Jeffery Henderson ("Henderson") is an attorney with Duane Morris, LLP.

24. Lynch retained Henderson sometime in 2004.

25. Henderson was not involved in any prior agreements relating to FCC's retirement obligation to Lynch.

26. Henderson was originally retained in connection with a potential buyout by the Lynches of Shallow's interest in FCC.

27. Henderson represented Lynch and Lynch, III in connection with the 2007 Agreement.

28. Henderson did not represent FCC or Shallow in connection with the 2007 Agreement.

29. Henderson personally assisted the Lynches in the negotiation and drafting of the 2007 Agreement.

30. At the time the 2007 Agreement was negotiated, Lynch was a director but no longer an employee of FCC.

31. As part of the 2007 Agreement, the Lynches agreed to transfer their shares in the Debtor, FCC, as well as a non-debtor entity, Fitzpatrick Container, LLC, to Shallow.

32. As part of the 2007 Agreement, Shallow agreed to pay certain cash amounts to the Lynches, transfer his partnership interest in a separate entity, Montgomery Mills, to Lynch III, and transfer ownership of an interest in a parcel of real property to Lynch III.

33. The 2007 Agreement included terms obligating FCC to continue making retirement payments to Lynch, provide medical and dental insurance benefits for Lynch and his wife, and requiring Shallow to cause FCC to make those payments.

34. The 2007 Agreement also included restrictive covenants and mutual releases between the parties.

35. The 2007 Agreement did not require Lynch to act as an "ambassador" for FCC after closing or otherwise work for FCC.

36. The 2007 Agreement indicated that it should not be construed as creating an employment relationship between FCC and any member of the Lynch family.

37. The 2007 Agreement required Lynch to resign as a director of FCC and required Lynch, III to resign as an employee of FCC.

**FCC's Financial Status 2017-2019**

38. Hano and Ginsberg LLP ("Hano") prepared audited financials for FCC for years ending December 31, 2016, and 2017.

39. The 2016 and 2017 audited financials for FCC reflect the following relevant data:

|  | 2016 | 2017 |
|---|---|---|
| Total assets | $8,810,233.00 | $9,488,772.00 |
| Total liabilities | $7,315,572.00 | $8,029,080.00 |
| Accounts Receivable | $4,144,729.00 | $3,601,771.00 |
| Receivables, related parties | $513,884.00 | $562,540.00 |
| Loan costs, net of accumulated amortization | $16,700.00 | $10,298.00 |
| Net sales | $18,277,965.00 | $19,635,665.00 |
| Operating costs and expenses | $17,553,143.00 | $18,944,341.00 |
| Income from operations | $724,822.00 | $690,834.00 |

40. The Hano financial statements note that the related-party receivables resulted from periodic advances of funds from FCC to companies related through common ownership.

41. The Hano statements included the payments to Lynch as an operating expense line item labeled "Retirement, former stockholder" and listed $72,800 as the associated expense in both 2017 and 2016.

42. The Hano financial statements did not include an estimation of the net present value of the long-term liability to Lynch.

43. FCC's tax returns for 2016 through 2019 reflect "ordinary business income" at the following amounts.

| Year | "Ordinary Business Income" |
|------|----------------------------|
| 2016 | $417,942.00 |
| 2017 | $254,122.00 |
| 2018 | ($878,986.00) |
| 2019 | ($2,507,264.00) |

**FCC's Bankruptcy**

44. On October 19, 2020, four (4) petitioning creditors filed an involuntary chapter 7 bankruptcy against FCC.

45. The petitioning creditors were GP Corrugated, LLC ("GP"[5]); Kampack, Inc.; WestRock CP, LLC; and WestRock Southern Container, LLC.

46. Each of the petitioning creditors listed a claim for "sale of goods on credit."

47. GP filed a proof of claim on April 16, 2021, for an unsecured debt of $1,264,555.58.

48. GP provided its transaction history with FCC and a list of unpaid invoices.

49. GP's transaction history shows that payments changed from check to wire payments in May of 2018.

50. GP's list of unpaid invoices shows the earliest still-outstanding invoice has a due date of July 06, 2018.

---

[5] This entity also used the name Georgia-Pacific LLC at times.  See Claim 6-1 in the main case.

51. On September 14, 2022, the Trustee was permitted to employ Bederson, LLP

    ("Bederson") as accountants for the estate.

52. Christopher Phillips ("Phillips") is a CPA and has been employed by Bederson since

    2002.

53. Phillips is a director for Bederson's Insolvency and Litigation Department.

54. Phillips and his staff reviewed several financial documents of the Debtor, including banks

    statements, the Hano audited financial statements, FCC's unaudited financial statement

    for 2018, and FCC's trial balance for 2019.

**Lynch Adversary Proceeding**

55. The Debtor's bank records show thirty-six (36) transactions made by FCC to the payee

    "John B. Lynch Jr." between October 24, 2016, and August 20, 2019, totaling

    $208,767.03.

56. Prior to filing the Complaint, the Trustee sent a demand letter to Lynch, requesting the

    funds be returned to the estate.

57. Lynch engaged McGowan to assist in negotiating a resolution with the Trustee.

58. McGowan sent a letter to the Trustee on October 3, 2023, offering to settle the matter.

59. McGowan attached a portion of the 2007 Agreement to the letter.

60. McGowan also attached an IRS life-expectancy table to the letter indicating that an 87-

    year-old individual has a required minimum distribution period of 14.4 years.

61. The Trustee filed her Complaint against Lynch in the instant Adversary Proceeding on

    October 30, 2023.

**Insolvency Analysis Facts**

62. Phillips and his team conducted an insolvency analysis of the Debtor for the four (4)

   years prior to the bankruptcy filing.

63. Phillips relied on the Hano audited financial statements, FCC's unaudited financial

   statement for 2018, and FCC's trial balance for 2019 in preparing the insolvency analysis.

64. FCC's own financial documents show it to be solvent in 2016, 2017, and 2018.

65. FCC's own trial balance shows it to be insolvent in 2019.

66. Phillips and his team made several adjustments to FCC's financials as part of the

   insolvency analysis.

67. For each year, Phillips valued "Loan costs, net of accumulated amortization" and assets

   pertaining to related-party receivables at zero.

68. In each year, Phillips tabulated FCC's estimated remaining monthly obligations to Lynch

   as a lump sum liability reduced to present value, using an interest rate of 6%, with the

   following final sums.

| Year | "Retirement Liability Owed to Former Shareholder, at Discounted Cash Value" |
|------|------|
| 2016 | $874,000.00 |
| 2017 | $852,857.00 |
| 2018 | $830,410.00 |
| 2019 | $806,578.00 |

69. After adjustments were made, the Bederson insolvency analysis shows FCC to be solvent

   in 2016 but insolvent in 2017, 2018, and 2019.

70. The final book value of FCC for each year asserted in the Bederson insolvency analysis is
as follows:

| Year | Amount Solvent per debtor's financials | Bederson Adjustments | Adjusted Amount Solvent |
|---|---|---|---|
| 2016 | 1,494,661 | (1,484,992) | 9,669 |
| 2017 | 1,459,692 | (1,506,103) | (46,411) |
| 2018 | 349,372 | (1,713,448) | (1,364,076) |
| 2019 | (2,483,438) | (1,939,966) | (4,423,404) |

71. A disinterested attempt to reduce Lynch's stream of future payments to present value
might or might not use the IRS life-expectancy table as an indicator of life-expectancy.

72. For accounting purposes, it is acceptable to list payments of the kind made to Lynch like
a salary being expensed monthly.

73. For accounting purposes, it is also acceptable to list payments of the kind made to Lynch
as a lump sum liability estimated at its present value.

74. For accounting purposes, it is often acceptable to write off related-party receivables.

75. A conservative valuation of related-party receivables would not write off the total amount
unless a good faith effort to collect those receivables was unsuccessful.

76. It is appropriate to write off loan costs when converting book value to fair market value.

77. Loans to related parties are common and not necessarily an indication of insolvency.

78. Related-party receivables liability increased significantly in 2018 and 2019.

79. Phillips did not find any evidence that related-party receivables were ever being paid
down.

80. Bederson's insolvency analysis did not make any upward adjustments for estimation of potential unlisted assets, like valuable leaseholds, software, vendor relationships, skilled personnel, or good will.

81. McGowan interpreted the relatively flat receivables value between 2016 and 2017 financials to indicate that FCC's customers were not holding back payment during this time.

82. FCC's receivable declined severely in 2018 and 2019, from 4.1 million in 2017 to 3.3 million and then to 1.474 million.

83. McGowan testified that a sharp decline in receivables can indicate that a business stopped doing business during that year.

84. Phillips reviewed the Debtor's bank statements showing the timing and value of payments made to creditors.

85. In reviewing the Debtor's financials, Phillips saw that the Debtor's liabilities trended up which is a strong indication that it was not paying its debts as they came due.

86. FCC was often paying GP invoices a month after their due date.

87. In 2018, GP invoices were being paid more than a month late.

88. In 2018, FCC stopped making payments by check and began making wire transfers to satisfy GP invoices.

89. A creditor's decision to demand payment by wire rather than check may suggest a pattern of delayed or missed payments.

90. By 2019, GP was requiring cash-on-delivery or pre-cash-on-delivery.

91. A creditor's decision not to ship goods without prepayment usually indicates an inability of the payor to pay bills on time.

**McGowan's Expert Report**

92. McGowan submitted an expert report dated March 26, 2024.

93. McGowan's report demonstrated that FCC derived an economic benefit by offering Lynch retirement benefits to avoid paying Lynch's full compensation.

94. McGowan testified that his report compares the relative value of Lynch's compensation and retirement benefits from the point of view of FCC at the time the 2007 Agreement was executed.

95. McGowan's report is unclear as to whether it is forward looking from the execution of the 2007 Agreement or an earlier date when Lynch had stepped down as president of FCC.

96. The report assumes that Lynch would continue to be paid $300,000.00 per year and would have worked an additional ten (10) years beyond his retirement.

97. The report assumes that Lynch would live twenty (20) years beyond the date of his retirement.

98. The report applies a 5% discount rate to estimate the then present value of the stream of executive compensation payments and retirement payments.

99. The report estimates that FCC saved $1,259,725.00 by accepting Lynch's retirement and making the monthly payments rather than continuing to pay his executive compensation.

100. McGowan does not have personal knowledge of Lynch's exact compensation at the time he retired.

101. McGowan admitted that he likely has archived notes related to his representation of Lynch prior to the 2007 Agreement but did not review those notes in preparing his expert report.

# IV. LEGAL STANDARD

## A.  Application of State Law Avoidance Statutes

Counts I and II of the Trustee's Complaint allege fraudulent transfers under Pennsylvania state law as made applicable by the Trustee's strong-arm powers under the Code.

11 U.S.C. § 544(a)(2) permits the Trustee to avoid transfers of the debtor's property that would be avoidable by a hypothetical unsatisfied execution creditor.  See In re Bridge, 18 F.3d 195, 199 (3d Cir. 1994).  Similarly, 11 U.S.C. § 544(b)(1) permits the Trustee to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim. . ."  These sections are well-understood to allow trustees to take advantage of state law statutes to avoid fraudulent transfers for the benefit of the estate.  See In re Roman Cath. Diocese of Harrisburg, 640 B.R. 59, 68 (Bankr. M.D. Pa. 2022); In re Island View Crossing II, L.P., 604 B.R. 181, 195 (Bankr. E.D. Pa. 2019).

The applicable nonbankruptcy law that the Trustee seeks to apply here is the Pennsylvania Uniform Voidable Transfer Act ("PUVTA").  12 Pa. C.S. § 5101(a).  Counts I and II of the Trustee's Complaint invoke §§ 5104(a) and 5105 of the PUVTA which provide the Trustee with causes of actions that are substantially similar to the actual and constructive fraud provisions under § 548 of the Code.  See In re Fitzpatrick, 663 B.R. at 655.  The PUVTA does provide the Trustee with a four (4) year lookback period from the date of the bankruptcy filing, as opposed to the two (2) year period provided by the Code.  See id. at 660.  However, the amount and timing of the challenged transfers are not at issue; as indicated in my prior Opinion, summary judgment was denied because factual issues remained regarding insolvency, reasonably

equivalent value, and actual fraudulent intent—all issues materially the same under the PUVTA

and the Code.  See id. at 655-57.

## B.  Constructive Fraud

Counts I and IV of the Trustee's Complaint allege that transfers to Lynch were

constructively fraudulent.

Avoiding a transfer as constructively fraudulent requires the Trustee to demonstrate that

the Debtor was insolvent at the time of the transfer—or rendered insolvent by the transfer—and

that the Debtor did not receive reasonably equivalent value for the transfer.  See 12 Pa.C.S. §

5105; 11 U.S.C. § 548(a)(1)(B).[6]  The Trustee bears the burden of proving these elements by a

preponderance of the evidence.  See 12 Pa. C.S. § 5105(b); In re Wettach, 811 F.3d 99, 107 (3d

Cir. 2016).

A debtor is presumed insolvent, for purposes of the PUVTA, if it is not paying its debts as

they become due.  12 Pa. C.S. § 5102(b).  Alternatively, the Trustee may prove insolvency

directly by demonstrating "book value" insolvency.  In re R.M.L., Inc., 92 F.3d 139, 154–55 (3d

Cir. 1996).  "A debtor is insolvent if, at fair valuation, the sum of the debtor's debts is greater

than the sum of the debtor's assets."  12 Pa. C.S. § 5102(a).  See also 11 U.S.C. §101(32)(A)

(defining insolvency, as applicable to FCC, as a "financial condition such that the sum of such

entity's debts is greater than all of such entity's property, at a fair valuation. . .").

---

[6]     The relevant statutes provide multiple ways to demonstrate insolvency.  See In re Opus E. LLC, 698 F.
App'x 711, 715 (3d Cir. 2017) (describing the statutory alternatives under 11 U.S.C. § 548(a)(1)(B)(ii)); see also 12
Pa. C.S. § 5104 (a)(2)(i) and (ii).  However, based on the presentation of evidence, the Trustee is only pursuing a
"book value" showing of insolvency and a presumption of insolvency based on the Debtor not paying its debts as
they become due.  See Day 1 Transcript, doc. #133 at 5 ("The Trustee will also show the Debtor was insolvent at the
time that these payments were made. This will be shown through a balance-sheet test. And also, the Debtor was
unable to pay its debts as they became due.")  Other statutory tests will not be addressed in this Opinion.

"Reasonably equivalent value" is not a defined concept.  See BFP v. Resol. Tr. Corp., 511

U.S. 531, 535 (1994).  In the Third Circuit, courts apply a two-step process in determining

reasonable equivalent value; "the court should consider: (1) whether any value is received, and

(2) whether the value was reasonably equivalent to the transfer made." In re Incare, LLC, 2018

WL 2121799, at *11 (Bankr. E.D. Pa. May 7, 2018) (citing In re R.M.L., 92 F.3d 139, 152 (3d

Cir. 1996)).  Both the Code and the PUVTA define "value" to include satisfaction of an

antecedent debt of the debtor.  See 11 U.S.C. § 548(d)(2)(A); 12 Pa. C.S. § 5103(a).  Once a

court finds that the debtor received at least some value, it must then determine "whether the

debtor got roughly the value it gave." In re Fruehauf Trailer Corp., 444 F.3d 203, 213 (3d Cir.

2006).  This is a "totality of the circumstances" test and typically requires courts to analyze "(1)

the fair market value of the benefit received as a result of the transfer, (2) the existence of an

arm's-length relationship between the debtor and the transferee, and (3) the transferee's good

faith." Id. (internal quotation marks omitted).  However, payments made to satisfy a prior

enforceable debt or obligation are necessarily transfers made for reasonably equivalent value.

See In re Ctr. City Healthcare, LLC, 664 B.R. 208, 219 (Bankr. D. Del. 2024).

## C.  Actual Fraud

Counts II and III of the Trustee's complaint alleged that transfers to Lynch were actually

fraudulent.

Avoiding a transfer as actually fraudulent requires the Trustee to prove that the transfers

were made "with actual intent to hinder, delay, or defraud" creditors.  11 U.S.C. § 548(a)(1)(A);

12 Pa. C.S. 5104(a)(1).  In recognition of the often-impossible task of producing direct evidence

of fraudulent intent, courts look for relevant indicia of fraud known commonly as "badges of

fraud." See In re Carbone, 615 B.R. 76, 80 (Bankr. E.D. Pa. 2020). The PUVTA provides a

nonexclusive list of such badges:

> In determining actual intent under subsection (a)(1), consideration may be given, among
> other factors, to whether:
> (1) the transfer or obligation was to an insider;
> (2) the debtor retained possession or control of the property transferred after the transfer;
> (3) the transfer or obligation was disclosed or concealed;
> (4) before the transfer was made or obligation was incurred, the debtor had been sued or
> threatened with suit;
> (5) the transfer was of substantially all the debtor's assets;
> (6) the debtor absconded;
> (7) the debtor removed or concealed assets;
> (8) the value of the consideration received by the debtor was reasonably equivalent to the
> value of the asset transferred or the amount of the obligation incurred;
> (9) the debtor was insolvent or became insolvent shortly after the transfer was made or
> the obligation was incurred;
> (10) the transfer occurred shortly before or shortly after a substantial debt was incurred;
> and
> (11) the debtor transferred the essential assets of the business to a lienor who transferred
> the assets to an insider of the debtor."

12 Pa. C.S. § 5104(b).

Application of these "badges" varies by case, and no particular badge or set of badges

mandates a finding of actual fraudulent intent. See In re Carbone, 615 B.R. at 80-81 (citing

cases). Courts are free to "evaluate all relevant circumstances" and consider any evidence

suggesting an intent to hinder, delay, or defraud creditors. Uniform Law Comment 7 to 12 Pa.

C.S. § 5104.

### D. Unjust Enrichment

Count VI of the Trustee's complaint alleged that the Transfers to Lynch are avoidable

under a theory of unjust enrichment.

Unjust enrichment is an equitable doctrine that allows the court to imply a contract when

a party would otherwise be able to retain an unconscionable windfall at the expense of another

party.  See Styer v. Hugo, 619 A.2d 347 (Pa. Super. 1993), aff'd, 637 A.2d 276 (Pa. 1994);

Torchia v. Torchia, 499 A.2d 581, 582 (Pa. Super. 1985).

> The elements necessary to prove unjust enrichment are:
> (1) benefits conferred on defendant by plaintiff;
> (2) appreciation of such benefits by defendant; and
> (3) acceptance and retention of such benefits under such circumstances that it
> would be inequitable for defendant to retain the benefit without payment of value.

Mitchell v. Moore, 729 A.2d 1200, 1203-04 (Pa. Super. 1999) (citing Schenck v. K.E. David,

Ltd., 666 A.2d 327, 328 (Pa. Super. 1995)).


## V. DISCUSSION


### A.  The Transfers were not constructively fraudulent because the Debtor received reasonably equivalent value

The Trustee seeks to avoid the Transfers, the series of payments made by FCC to Lynch,

during the four (4) year lookback period just prior to FCC's bankruptcy.  There is no dispute

about the amount of the Transfers, the timing of the Transfers, or the identity of the transferor

and transferee.  Therefore, the Trustee needs only to satisfy the remaining elements of insolvency

and lack of reasonably equivalent value to claw back the amounts transferred.


### i.  Presumptive Insolvency

For purposes of the PUVTA, a debtor is presumed insolvent if it is not paying its debts as

they become due.  12 Pa. C.S. § 5102(b).  This presumption exists because of the recognized

difficulties in proving insolvency as a creditor; once a showing of general nonpayment of debts is

established, the burden shifts to the resisting party to demonstrate that solvency is more likely

than not.  See Uniform Law Comment 2 to 12 Pa. C.S. §5102; In re Incare, 2018 WL 2121799 at

*9.  When deciding whether the presumption applies, the court

should take into account such factors as the number of the debtor's debts, the proportion of those debts not being paid, the duration of the nonpayment, and the existence of bona fide disputes or other special circumstances alleged to constitute an explanation for the stoppage of payments. The court's determination may be affected by a consideration of the debtor's payment practices prior to the period of alleged nonpayment and the payment practices of the trade or industry in which the debtor is engaged.

Id.

Based on the factual record, FCC was presumptively insolvent from some point in 2018 onward. FCC was placed into an involuntary bankruptcy on October 19, 2020. Each of the four (4) petitioning creditors filed proofs of claim in the lead bankruptcy case, alleging outstanding payments from 2018. Further, GP's full payment history during the relevant lookback period was entered into evidence and demonstrates FCC's inability to pay its debts as they came due. See J-98 and J-99.

GP had accepted check payments from FCC until 2018 with payments routinely being made up to a month late. FoF #'s 49, 86. In mid-2018, payments grew more delayed until September 05, 2018, when all payments switched to wire transfers. FoF #'s 87, 88. By 2019, GP was requiring same-day payments for deliveries or even requiring prepayment. FoF # 90. Additionally, GP's total claimed amount stems from all outstanding invoices, the earliest of which was due on July 06, 2018, and remains unpaid to this day. FoF # 50. The conclusion that FCC was unable to pay debts as they came due is supported by the overall trend in the Debtor's falling accounts receivables and rising liabilities, both regarding related and third-party creditors. FoF #'s 78, 79, 82. Lynch has not provided evidence to rebut this presumption of insolvency.

Therefore, based on FCC's inability to timely pay its debts, FCC was presumptively insolvent beginning in mid-2018.

### ii.    Book Value Insolvency

The Trustee also attempted to show insolvency by demonstrating book value insolvency for the entire period during which the Transfers were made.  The Trustee's accountants conducted an insolvency analysis by reviewing the available end-of-year financial statements and other records of the Debtor.  The insolvency analysis included several downward adjustments to FCC's value.

The Code defines insolvency as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation. . ." 11 U.S.C. §101(32)(A).  This test is sometimes referred to as the "balance sheet" test.  In re R.M.L., Inc., 92 F.3d 139, 154–55 (3d Cir. 1996).  The party challenging the transfer bears the burden of showing that at the time the transfer was made, a tally of the corporation's assets and liabilities shows its debts exceed its assets.  See id.  While termed a "balance sheet" test, the "court's insolvency analysis is not literally limited to or constrained by the debtor's balance sheet."  Peltz v. Hatten, 279 B.R. 710, 743 (D. Del. 2002), aff'd sub nom. In re USN Commc'ns, Inc., 60 F. App'x 401 (3d Cir. 2003); see also Covey v. Com. Nat. Bank of Peoria, 960 F.2d 657, 660 (7th Cir. 1992) ("Accountants may value assets at cost ('book value'), but if the market value of a firm's assets exceeds its liabilities, it is solvent notwithstanding red ink in the balance sheet.  The reverse is true as well: a firm whose assets are worth less than book value may be insolvent despite a financial statement showing positive net worth.  Market value of both assets and liabilities determines solvency.").

The proper method of valuation is context dependent, and the "fair value" of a business' assets might be its going concern value or liquidation value.  See In re EBC I, Inc., 380 B.R. 348, 355 (Bankr. D. Del. 2008), aff'd, 400 B.R. 13 (D. Del. 2009), aff'd, 382 F. App'x 135 (3d Cir.

2010); In re American Classic Voyages Co., 367 B.R. 500, 508 (Bankr. D. Del. 2007). That is, the court must apply the "appropriate premise of value" when determining the fair value of the debtor. In re Fisher, 575 B.R. 640, 645 (Bankr. M.D. Pa. 2017). Liquidation valuation "is only appropriate where bankruptcy is 'clearly imminent' and the 'business is on its deathbed.'" In re Opus E. LLC, 698 F. App'x 711, 715 (3d Cir. 2017) (citing Moody v. Sec. Pac. Bus. Credit, Inc., 971 F.2d 1056, 1067 (3d Cir. 1992)). Alternatively, going concern value is determined by reasonably assessing assets' fair market value under normal conditions. See In re Opus, 698 F. App'x at 715. It may be appropriate to adjust the value of assets or liabilities up or down, or to include excluded assets and liabilities, to properly reflect the fair value of the business as a going concern. See In re EBC I, 380 B.R. at 356. The Third Circuit has held that it is appropriate to consider intangible assets, like good will, when determining insolvency. Id. (citing Mellon Bank, N.A. v. Metro Commc'ns, Inc., 945 F.2d 635, 647 (3d Cir. 1991).

Therefore, the court must first determine the proper premise of valuation. Only after deciding whether the company should be given a going concern or liquidation value can the Court determine whether the adjustments made in the insolvency analysis were proper. Based on application of the proper adjustments, it can then be determined if and when FCC was book value insolvent.

a. *Proper Premise of Valuation*

The parties were in sharp disagreement about the proper standard for valuation of FCC for purposes of determining insolvency. The Trustee insisted that for purposes of book value, the Court need not look at the "fair market value" of the business' assets. Alternatively, Lynch insisted that "[m]ere book insolvency" was insufficient and that the Trustee was required to show that liabilities exceeded assets at "fair market value." Neither party is entirely correct.

21

As discussed, because the proper method of valuation when determining book value is context dependent, the Court must first determine whether FCC was a going concern on the date of a particular valuation. If a business is clearly headed for bankruptcy on a certain date, then a liquidation valuation is proper, and the Trustee is correct insofar as an adjusted book value reasonably represents the fair value of the business. On the other hand, a going concern, even a struggling one, should be valued as such and adjustments up and down are warranted to the extent they accurately capture the going concern value of the company as a whole. See In re EBC I, Inc., 380 B.R. at 355 ("[A] business does not have to be thriving in order to receive a going concern valuation.") (quoting In re American Classic, 367 B.R. at 508).

FCC was a going concern at the end of years 2016 and 2017. A going concern valuation is likely appropriate for any business with positive net worth and cash flow. See Moody v. Sec. P. Bus. Credit, Inc., 971 F.2d 1056, 1068 (3d Cir. 1992) (affirming the district court's decision to apply going concern basis when valuing Debtor's assets, noting a substantial net worth and positive cash flow). While we are privy to the final chapter of FCC's existence, it is inappropriate to allow hindsight bias to infect the insolvency analysis. Based only on what was known at the end of 2017, FCC was a profitable company with substantial assets. From 2016 to 2017, FCC's audited financial statements indicate the following: (1) assets rose from $8,810,233.00 to $9,488,772.00; (2) liabilities rose from $7,315,572.00 to $8,029,080.00; (3) net sales rose from $18,277,965.00 to $19,635,665.00; (4) operating costs and expenses rose from $17,553,143.00 to $18,944,341.00; and (5) income from operating fell slightly from $724,822.00 to $690,834.00. FoF # 39. While numbers alone do not tell the whole story of a business, and all manner of creative stories can emerge from them, FCC cannot be said to have been on its deathbed or clearly headed toward bankruptcy at the end of 2017. FCC was a functioning

22

business, generating substantial income.  FoF #'s 39, 43.  The Trustee presented no evidence to

show that FCC was having difficulties with creditors any time prior to 2018.  FoF # 81.  Rather,

nearly nineteen million dollars flowed out of the business in operating costs and expenses,

suggesting that creditors were getting paid.

By the end of year 2018, however, several facts indicate that FCC was headed for

bankruptcy and that a liquidation valuation is appropriate for this year.  As discussed, 2018 was

the year that petitioning creditors were not being paid on time; invoices from this year remain

unpaid.  FoF #'s 45, 46, 49, 50.  While the Debtor's unaudited financial statement is not before

me, the Bederson analysis and the Debtor's tax returns suggest a marked downturn for the

company in 2018.  According to the Bederson analysis, the Debtor's own documents show its

"Amount Solvent" as holding steady from 2016 to 2017 at about 1.5 million dollars with a sharp

drop in 2018 of over 1 million dollars to $349,372.00.  FoF # 70.  Additionally, the Debtor's

"Receivables, related parties" which had remained relatively stable between 2016 and 2017,

jump significantly in 2018 and then again in 2019.  FoF # 39, 78.  The Debtor's third-party

receivables drop by nearly a million dollars in 2018 and then by nearly 2 million in 2019.  FoF

# 82.  Together, these changes suggest that FCC was losing significant business or ceased

business operations during this year and was simultaneously pushing money out of the business

to related parties.  FoF # 83.  FCC's tax returns tell a similar story.  FCC reported several

hundred thousand in profits in 2016 and 2017.  FoF # 43.  In 2018, FCC reported a loss of

$878,986.00 and then, in 2019, a further loss of $2,507,264.00.  Id.

Therefore, at end of year 2017, FCC was a going concern and should be valued as one.

However, in 2018 and 2019, the facts suggest that FCC was in a tailspin toward bankruptcy and

liquidation valuation is appropriate.

b.  *Bederson Adjustments*

With the appropriate premise of value established, it is necessary to decide whether the

Bederson adjustments in the insolvency analysis were proper.  Without any adjustment, FCC's

own financials for 2016, 2017, and 2018 show the business to be solvent.  FoF # 70.  Bederson

made three (3) substantive adjustments to those underlying financials: writing off loan costs,

writing off related receivable assets, and including a lump sum liability to account for future

retirement payments to Lynch.

*Loan Costs*

Writing off the loan costs was appropriate.  For accounting purposes, businesses may (or

indeed might be required to) capitalize certain costs associated with loans as an asset.  Such

capitalization is, however, an accounting fiction, not a true asset with value to any third party.

The parties agree that it was proper for Bederson to adjust loan cost values to zero.  FoF # 76.

*Related-Party Assets*

Writing off related receivables and other assets tied to related parties was proper in 2018

and 2019, but not in 2017.  The related receivables value hovered around a half-million dollars

with a modest increase from 2016 to 2017.  FoF # 39.  However, in 2018 and 2019 that amount

rose sharply.  FoF # 81.  Depending on the circumstances, it may be appropriate to treat related-

party receivables as uncollectable.  FoF #'s 74, 75.  Such transactions are not indicative of

insolvency or inherently underhanded but might simply be a tax-friendly method for shifting

cash between related entities or providing a dividend to a shareholder.  FoF # 77.  However, a

conservative accounting of a business' assets would not write off the amount entirely unless a

good faith effort to collect had been made or it was known to be uncollectable.  FoF # 75.

Here, applying a going concern lens at the end of 2017, the Court cannot reasonably conclude that these related-party accounts were worthless.  The amounts remained relatively flat between 2016 and 2017 which could indicate that no accounts were originated or paid, or that the accounts were being paid in step with the amounts originated.  Hano's audited financials note that the related-party receivables resulted from advances of funds to companies owned through common ownership.  See P-3; FoF # 40.  Note 1 of the financial statement identifies two related entities; one that owned the industrial building in which FCC was the sole tenant, and the other that secures purchase contracts for FCC.  Id.  In 2017, it is reasonable to assume that these related parties had assets, that FCC could have collected on these accounts to some degree, and that these accounts would affect a reasonable attempt to appraise the business as a going concern.  Moreover, Hano's decision to include those accounts in an audited financial statement suggests the firm was not comfortable writing those values off as uncollectable at the time.

By 2018 it is appropriate to write off the related-party receivables in full.  In context, the sudden jump in related-party receivables suggests these accounts were not intended to be collectable assets with any value.  Rather, given that third-party receivables were plummeting, creditor relations were suffering, and reported business income was deep in the red, these ballooning related-party receivables appear to be a method for extracting cash from the sinking business.  Therefore, in a liquidation context, it was proper for the Trustee's accountant to write off the related-party assets entirely when assessing FCC's value in 2018 and 2019.

*Lynch's Retirement Payments*

Reducing Lynch's future stream of payments to a present value liability was proper.  The Hano financials tabulated Lynch's payment as a face value monthly expense, much like a monthly salary or any other recurrent overhead costs.  FoF #'s 41, 42.  While there is nothing

improper about Hano's decision, for purposes of either a going concern or a liquidation valuation, it is also reasonable to attempt to reduce that future liability to a present value. FoF #'s 72, 73.  If the business were to be sold as a going concern, a reasonable buyer would likely demand a substantial discount on the price to account for this indefinite obligation to pay thousands of dollars a month to a third party.  Likewise, a liquidation analysis should attempt to estimate the value of any outstanding claims creditors have against the business when tabulating liabilities.

Also, the Court finds that there is no reason to disturb the value that Bederson attributes to Lynch's future claim against FCC.  Bederson relied on the IRS life expectancy tables to estimate how long Lynch was likely to live, and thus the length of the company's corresponding obligation to make monthly payments.  FoF # 68.  Phillips estimated the total amount of those payments, then reduced the value of those future payment to present value using a discount factor of six (6) percent.  Id.  Lynch argued that it was improper to use the IRS life expectancy tables for this purpose.  However, McGowan, in his expert report, attempted to estimate a similar value: the present value to the Debtor by accepting Lynch's retirement and foregoing his future salary.[7]  FoF # 60.  Reasonably, McGowan opted to use the IRS life expectancy tables and a five (5) percent discount factor in this endeavor.  FoF # 98.  Phillips' decision to use the same table and a more conservative discount factor to reduce Lynch's future monthly payments to present value was equally reasonable.

---

[7] See infra, note 8.

c. *Solvency*

Applying a going concern valuation, FCC was book value solvent during 2016 and 2017. The Hano financial statement and Bederson insolvency analysis both show the Debtor as solvent in 2016.  FoF #'s 39, 70.  No argument has been made that FCC was not solvent at end of year 2016.

The Hano 2017 financial statement indicates that the company was solvent by $1,459,692.00.  FoF # 39.  The Bederson insolvency analysis, after substantial adjustments, shows FCC was insolvent by $46,411.00 at that time.  FoF. # 70.  For two (2) reasons, the Trustee's showing of book value insolvency for this year are unconvincing.  First, given the relative dearth of reliable financial information on the Debtor, the figures in the Debtor's audited financials should not be disturbed lightly.  While the loan costs and Lynch payment adjustments are reasonable, the decision to write off related-party receivables entirely in the face of an audited statement listing them as valuable assets is inappropriate; the Debtor must be given some value for these accounts in 2017.  Second, McGowan testified convincingly that Bederson's three (3) adjustments alone fail to capture the going concern value of the business.  A disinterested attempt to determine the value of FCC in 2017 would have recognized it as a going concern and included values for potentially valuable leaseholds, software, vendor relationships, skilled personnel, or good will.  Even without a precise estimate of what these figures would be, given that FCC had assets worth several million dollars and generated nearly $700,000.00 in annual profit, a $46,411.00 insolvency margin could not survive even the most conservative upward adjustment for these several unlisted assets.

In 2018, applying a liquidation valuation, FCC was book value insolvent by end of year. FCC's internal financials purportedly show it was solvent by $349,372.00 at this time.  FoF # 70.

The Bederson analysis, after adjustments, shows FCC was insolvent by $1,364,076.00.  Id.  As discussed, all the Bederson adjustments for this year are appropriate.  Notably, the adjustment for related-party assets or Lynch's payments alone would be enough to show insolvency.

In 2019, the Debtor's own records show it was insolvent by over two million dollars. FoF # 70.  FCC was undoubtedly insolvent at end of year 2019.  Therefore, the Trustee has demonstrated that FCC was book value insolvent at the end of years 2018 and 2019.

### iii.    Reasonable Equivalent Value

The Trustee is also required to show that the Debtor did not receive "reasonably equivalent value" for the transfers.  This analysis proceeds by first determining whether FCC received any value from the transfers and, second, whether that value was "reasonably equivalent" to the transfers.  See In re R.M.L., Inc., 92 F.3d 139, 152 (3d Cir. 1996) (discussing the "two, discrete steps" of a reasonably equivalent value inquiry).

"Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied. . ." 12 Pa. C.S. § 5103.  "'[V]alue' means property, or satisfaction or securing of a present or antecedent debt of the debtor. . ." 11 U.S.C.A. § 548(d)(2)(A).  Payments made on a prior enforceable debt or obligation are necessarily transfers made for reasonably equivalent value.  See In re Ctr. City Healthcare, LLC, 664 B.R. 208, 219 (Bankr. D. Del. 2024).  It is widely understood that payments made to satisfy a contractual debt cannot be avoided as constructively fraudulent unless the underlying contract is first found to also be fraudulent or otherwise avoidable.  See In re TSIC, Inc., 428 B.R. 103, 115 (Bankr. D. Del. 2010).  A trustee's ability to avoid a payment

made on an antecedent debt may turn on the ability to avoid that underlying obligation.  See In re

Tanglewood Farms, Inc. of Elizabeth City, 487 B.R. 705, 713 (Bankr. E.D.N.C. 2013).

A particularly instructive case here is In re All-Type Printing.  274 B.R. 316 (Bankr.

D.Conn. 2002).  In All-Type, a closely held business was owned and operated by three

individuals.  Id. at 319.  While employed, the owners negotiated a retirement plan for one of their

members.  Id.  The retiring member was to cease employment, and the business was then

obligated to provide ongoing weekly cash payments and health and medical insurance for the

retiring member and his wife.  Id.  The business made numerous weekly cash payments for about

one year until payments abruptly ceased.  Id.  The business was in poor financial health at that

time but managed to operate for nearly four more years before filing for chapter 7 bankruptcy.

Id.

The trustee in All-Type attempted to avoid as constructively fraudulent the weekly cash

payments.  Id. at 322.  The court found that the trustee was unable to avoid the transfers, noting

that they were supported by reasonably equivalent value because the transfers were in

satisfaction of the business' contractual liability.  Id. at 324.  "[T]he individual satisfactions

flowing from each Payment provided 'reasonably'—indeed, perfectly—equivalent value in

exchange for such Payment."  Id.  Importantly, the court recognized that to have any chance of

avoiding the transfers as constructively fraudulent, the trustee needed to first avoid the *incurring

of the original retirement obligation*; the trustee's failure to do so precluded avoidance of any

subsequent payments made on the debt.  Id.

Analogously here, the Trustee's success in recovering the Transfers is contingent on her

ability to avoid the underlying obligation.  There is no dispute about the amount and timing of

the Transfers.  FoF #'s 18, 19, 21.  Therefore, if FCC's original obligation to make those monthly

29

payments is enforceable, all the Transfers were necessarily made for value and "'reasonably'—indeed, perfectly—equivalent value" because they satisfied the exact amount of a valid prior liability of FCC.

Based on the testimony at trial, the Court finds that FCC was obligated to make monthly retirement payments to Lynch for the remainder of his life based on an agreement between FCC and Lynch prior to the execution of the 2007 Agreement.  The requirements for contract formation under Pennsylvania law are offer, acceptance, and consideration.  See Koken v. Steinberg, 825 A.2d 723, 729 (Pa. Commw. Ct. 2003) (citing Hatbob v. Brown, 575 A.2d 607, 613 (Pa. Super. 1990)).  "An agreement is a valid and binding contract if: the parties have manifested an intent to be bound by the agreement's terms; the terms are sufficiently definite; and there was consideration."  In re Est. of Hall, 731 A.2d 617, 621 (Pa. Super. 1999).  Generally, a court will not inquire into the adequacy of consideration.  See Thomas v. Thomas Flexible Coupling Co., 46 A.2d 212, 216 (Pa. 1946).  Unlike many jurisdictions, Pennsylvania does not require contracts to be evidenced by writing when they cannot be performed within one year.  See Gallagher v. Med. Research Consultants, LLP, 2004 WL 2223312, at *3 (E.D. Pa. Oct. 1, 2004) (citing Kohr v. Kohr, 413 A.2d 687, 691 n.3 (Pa. Super. 1979)).  While neither party submitted a contract into evidence, there is adequate evidence in the record to demonstrate that an unavoidable obligation existed prior to 2007, requiring FCC to make monthly retirement payments to Lynch.

McGowan and Lynch both testified credibly as to the existence of such an agreement, whereby Lynch in consideration for his years of service to the company would receive deferred compensation in the form of ongoing monthly payments from the Debtor.  FoF #'s 13, 14, 15. McGowan assisted Lynch and Thomas Shallow Sr. in drafting that retirement plan sometime

around 2003.  FoF # 14.  The Debtor was a party to that contract and was obligated to begin

making monthly payments when Lynch retired from the company, as he did sometime prior to

the 2007 Agreement.  FoF # 18, 30.  Additionally, the 2007 Agreement explicitly mentions the

existence and terms of that prior obligation, likely to assure the parties that the retirement

obligation would survive the various releases contained in the 2007 Agreement.  FoF # 17.

Section 6 relates the definite terms of that agreement; FCC was required to make $6,066.66

monthly payments to Lynch for the remainder of his natural life.[8]  Id.  Shallow, as president of

the Debtor while the Transfers were made, also testified credibly that he understood the company

as legally obligated to make the Transfers.  FoF # 20.  While Shallow has not always been

forthright in this bankruptcy, his testimony is particularly compelling on this point because of the

acrimonious relationship between the Lynch and Shallow families; despite the feuding, these

retirement payments were being made prior to the execution of the 2007 Agreement and

continued without interruption until 2019.  FoF #'s 18, 19.  Thus, through the testimony of

several witnesses, the writing contained in section 6 of the 2007 Agreement, and the years of

continued performance by FCC, the Defendant has proved the existence of a valid and

enforceable obligation on the part of FCC to make the Transfers.

Despite the existence of this prior obligation, the Trustee argued that the Transfers lacked

reasonably equivalent value because Lynch did not provide any services to the Debtor between

---

[8]    Both parties spent an inordinate amount of time attempting to support or undermine the enforceability of
the 2007 Agreement. The 2007 Agreement mentions and reaffirms the prior retirement obligation and is probative of
the existence of that obligation. However, FCC's obligation to make monthly retirement payments to Lynch arose
prior to the execution of the 2007 Agreement. The Trustee's efforts to show that, based on discrete allocations of
purchase prices, consideration was lacking for portions of the 2007 Agreement are therefore irrelevant.

    Additionally, the 2007 Agreement and the prior retirement obligation are roughly twenty years old and not
subject to avoidance as a fraudulent transfer. Thus, the efforts by McGowan to provide an economic justification for
the terms of the obligation are therefore irrelevant; it is immaterial whether the Debtor received "reasonably
equivalent value" when assessing the enforceability of these decades-old contracts.

31

2016 and 2019.  McGowan's letter to the Trustee made oblique references about Lynch possibly

needing to stay on as an advisor or ambassador for the Debtor as part of the retirement plan.

Shallow stated that his understanding was that if called upon by the Debtor, Lynch might be

required to fulfill certain responsibilities relating to client relations.  However, Shallow also

testified that he never conferred any ambassador title on Lynch, nor did the Debtor call on Lynch

to provide any services.  FoF # 35.  Whether or not the retirement agreement placed a conditional

obligation on Lynch is irrelevant because neither Shallow nor the Debtor ever asked for such

services.  The Trustee fails in her attempt to paint this retirement obligation as an employment

contract by which Lynch was required to provide continual services to the Debtor.  The record

supports a different reading; McGowan's, Lynch's, and Shallow's testimony all point to an

ongoing, unqualified obligation on the part of FCC to make the monthly retirement payments.

To avoid the Transfers as constructively fraudulent, the trustee must show both

insolvency and lack of reasonably equivalent value.  The Trustee has demonstrated FCC was

insolvent for part of the relevant timeframe.  However, because the underlying agreement to

make the monthly payments to Lynch was an enforceable contractual obligation, the Transfers

were made for reasonably equivalent value, and therefore the Trustee is not entitled to avoid

them as constructively fraudulent.

## B.  The Transfers were not actually fraudulent because the Trustee has not shown that the Transfers were made with an intent to hinder, delay, or defraud creditors

The Trustee also seeks to avoid the Transfers as actually fraudulent.  To do so, the Trustee

must show that the transfers were made "with actual intent to hinder, delay, or defraud" creditors.

Courts consider "badges of fraud" when deciding whether the circumstantial evidence

supports a finding that actual fraudulent intent existed at the time challenged transfers were

made.  See In re Carbone, 615 B.R. 76, 80 (Bankr. E.D. Pa. 2020).  Among these badges, as

relevant here, are whether "(1) the transfer or obligation was to an insider. . . (3) the transfer or

obligation was disclosed or concealed. . . (8) the value of the consideration received by the

debtor was reasonably equivalent to the value of the asset transferred or the amount of the

obligation incurred. . . (9) the debtor was insolvent or became insolvent shortly after the transfer

was made or the obligation was incurred."  Id.

     While the Trustee has demonstrated insolvency at the time many of the Transfers were

made, this is not enough to prove actual fraud.  Although there is no particular combination of

badges that guarantees a finding of fraud, mere findings of insolvency and/or lack of reasonably

equivalent value are never enough to support a finding of actual fraud.  See In re Com. Loan

Corp., 396 B.R. 730, 747 (Bankr. N.D. Ill. 2008).  A finding of actual fraud on the elements of

constructive fraud would render constructive fraud statutes a nullity, allowing creditors to bypass

the temporal constraints on constructive fraud and make constructive fraud statutes superfluous.

See id.  Therefore, the Trustee must prove up other badges of fraud to succeed on her allegations

of actual fraud.

     Though the Trustee made little effort to demonstrate actual fraud at trial, one of the

developed arguments was that the Debtor concealed the payments to Lynch on its financial

documents.  This assertion, however, is belied by the documents themselves and the testimony of

the experts in this case.  While the Trustee believes it to be proper to show Lynch's liability as a

larger estimated sum of the present-value of future payments, there is nothing about the Debtor's

record-keeping that suggests fraudulent intent.  FoF # 72.  The audited financials explicitly show

and explain the payments to Lynch and describe them as a retirement obligation to a former

shareholder.  FoF # 41.  Indeed, both experts acknowledged that the decision to record these

payments as a monthly expense at face value was a reasonable one and in accordance with accounting standards. FoF # 72. Therefore, there is no credible evidence showing that FCC concealed the Transfers.

Though not a major subject of the trial, these payments were made to *Lynch*—a former president of the Debtor and uncle of Shallow. Under different circumstances, a decision to pay a similarly situated creditor might arouse suspicion of fraud. See In re Carbone, 615 B.R. at 81 (recognizing that certain badges of fraud based on the identity of the transferee allow for an inference of fraud because "there must have been a motivation other than the transaction itself because it was not an economically rational decision for a debtor to make but for its effect to hinder or delay creditors."). Though Shallow has been a difficult debtor-principal, the Court credits his brief testimony at trial as the truth. There was no love lost between Shallow and Lynch when these payments were made, but Shallow testified that he understood himself and FCC as contractually obligated to carry on making payments. FoF # 20. If anything, the identity of the transferee in context dispels any suspicion of fraud; if Shallow were to intentionally jilt any of his creditors, Lynch was likely to be among them.

Therefore, because there are insufficient indicia of fraudulent intent in the making of the Transfers, the Trustee is not entitled to avoid any of them as actually fraudulent.

## C.  Lynch was not unjustly enriched by the Transfers

The Trustee has not made a full-throated argument as to unjust enrichment, nor does it appear one could be made. There is no dispute that FCC transferred funds and Lynch received those funds. Therefore, the only question is whether "acceptance and retention of such benefits" would be inequitable. Mitchell v. Moore, 729 A.2d at 1203-04.

As discussed, FCC was contractually obligated to make the monthly payments to Lynch. What Lynch received each month was, far from inequitable, perfect satisfaction of a legitimate prior obligation of the debtor.  The Trustee offers no evidence that allowing Lynch to retain the payments already made to him would be inequitable.  Therefore, the Trustee is not entitled to avoid or recover any money from Lynch under a theory of unjust enrichment.

## VI. CONCLUSION

For the reasons set forth above, the Trustee has failed to show that the Transfers made to Lynch by the Debtor are avoidable and, consequently, judgment will be entered in favor of the Defendant.

**Date: May 16, 2025**

_____
**PATRICIA M. MAYER**
**U.S. BANKRUPTCY JUDGE**